**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:

| | | |
|---|---|---|
| **JOSEPH M. STABILE and PATRICIA M. STABILE,** | : : : | Bankruptcy No. 04-24447 BM |
| **Debtors** | : | Chapter 7 |
| ************************************************ | | |
| **RAPID FUNDING, LLC,** | : : | |
| **Plaintiff** | : : | |
| v. | : : | Adversary No. 04-3169 BM |
| **JOSEPH M. STABILE and PATRICIA M. STABILE,** | : : : | |
| **Defendants** | : | |

Appearances:  Brian A. Lawton, Esq., for Plaintiff
Paul J. Elias, Esq., for Debtors/Defendants

**MEMORANDUM OPINION**

Rapid Financing, LLC, plaintiff in this adversary action, seeks a determination that a debt in the outstanding amount of $134,293.79 owed by debtors Joseph and Patricia Stabile is not dischargeable.

Debtors maintain that the debt is dischargeable and, to the extent it is not, has been fully satisfied.

We conclude that the debt is not dischargeable and that the outstanding amount thereof is $110,965.28, plus interest at the default rate specified in the promissory note until it is fully satisfied.

## – FACTS –

Debtors, who are husband and wife, are the sole shareholders of Celestial Burial Case, Inc. and Celestial Life Planning, Inc. Debtor Joseph Stabile is the CEO of both corporations. The record does not indicate whether debtor Patricia Stabile has a hand in the day-to-day operation of the corporations.

In a last-ditch effort to stave off an impending sheriff's sale of their personal residence to satisfy a debt Celestial Burial Case owed to Enterprise Bank which they had guaranteed, debtors approached Rapid Funding in April of 2003 for a loan. Enterprise Bank and every other local financial institution debtors approached had turned down their desperate request for a loan.

Rapid Funding approved debtors' loan application on July 10, 2003. The loan closing took place on July 16, 2003.

At the closing, debtors, Celestial Burial Vault and Celestial Life Planning executed a promissory note in the principal amount of $314,000.00 and delivered it to Rapid Funding. The rate of interest on the unpaid balance of the note was fifteen percent *per annum*. Interest only was due for the first eleven months, with the outstanding balance due and payable in full on July 1, 2004. The first payment on the note was due on September 1, 2004.

In the event of a default, the entire unpaid balance became due and began to accrue interest, compounded monthly, at the rate of thirty-six percent *per annum*. If the default rate of interest exceeded the maximum rate allowed under Pennsylvania law, the parties

agreed that the default rate of interest would be the maximum possible rate permitted by law.

Debtors represented and warranted in the note that the loan was entered into solely for a business or commercial purpose, and that the proceeds of the loan would not be used for personal, family or household purposes.

Debtors authorized judgment to be confessed against them for, among other things, the unpaid principal amount, plus all accrued interest at both the initial rate of fifteen percent and at the default rate of thirty-six percent.

Both debtors executed the promissory note and the warrant for confession of judgment. Debtor Joseph Stabile executed them for Celestial Burial Case and Celestial Life Planning as their CEO.

As security for the loan, both debtors, Celestial Burial Case and Celestial Life Planning executed a security agreement. Among other things, they granted Rapid Funding a security interest in all accounts, deposit accounts, accounts receivable and any bank accounts they had. Shortly thereafter, Rapid Funding perfected its security interest by filing appropriate financing statements.

As additional security for the loan, debtors granted Rapid Funding a first priority mortgage on their personal residence and a vacant tract of land. Rapid Funding duly recorded the mortgage shortly thereafter.

The initial payment under the promissory note was due on September 1, 2003. Debtors defaulted at the very outset when they failed to make the first payment. A check

dated September 1, 2003, was returned because of insufficient funds. Efforts to resolve the matter proved fruitless.

Wasting no time, Rapid Funding promptly seized $140,173.76 from an account in the name of debtor Diane Lynn Stabile on October 1, 2003, and applied it to the unpaid balance of the loan.

On October 12, 2003, Rapid Funding confessed judgment against debtors, Celestial Burial Case and Celestial Life Planning. The amount of the judgment was $215, 638.48.

Between November 12, 2003, and October 19, 2004, Rapid Funding also seized a total of $13,991.12 from an account of one of the corporations who were also indebted to Rapid Funding under the promissory note.

On April 2, 2004, shortly before a scheduled sheriff's sale of the two real properties subject to Rapid Funding's mortgage lien was to take place, debtors filed a voluntary joint chapter 7, petition. The sale was automatically stayed as a result of the filing.

Debtor's amended schedules listed assets with a total declared value of $266,625.00 and liabilities totaling $552,017.10. Included among the assets were the two real properties subject to the mortgage lien of Rapid Funding. Their combined declared value was $218,500.00. Rapid Funding was listed as having an undisputed secured claim in the amount of $200,000.00.

Rapid Funding was granted relief from stay pursuant to § 362(d)(2) of the Bankruptcy Code on May 7, 2004, so that a sheriff's sale of the above properties could go forward. We concluded that debtors had no equity in the properties and, because debtors had filed under chapter 7, that they were not necessary to an effective reorganization. A

sheriff's sale of the properties took place on September 7, 2004. Rapid Funding bid the sum of $228,000.00 and purchased the properties. Sheriff's deeds for the properties were issued in October of 2004. Debtors vacated their residence on November 18, 2004, at which time Rapid Funding took possession of it.

Rapid Funding commenced this adversary action on October 10, 2004, seeking a determination that the debt owed by debtors was excepted from discharge by §§ 523(a)(2)(A) and (B) and § 523(a)(4) of the Bankruptcy Code.

An on-going discovery dispute erupted prior to trial and resulted in orders which redounded to debtors' detriment.

We issued an order on March 11, 2005, granting a motion by Rapid Funding to compel discovery. Debtors were directed to answer certain interrogatories propounded by Rapid Funding "or suffer further sanctions".

Debtors then brought a motion for reconsideration of this order on March 11, 2005. The motion was denied after a hearing on April 20, 2005. Once again debtors were directed to respond to the discovery requests of Rapid Funding within a specified period of time.

Debtors' recalcitrance did not end with this order. On March 13, 2005, Rapid Funding brought a motion for supplementary relief in the form of sanctions. Rapid Funding alleged that debtors had failed to respond to its discovery requests in an appropriate manner and sought, as a sanction, an order which made express determinations as to the non-dischargeability of the debt owed to Rapid Funding by debtors.

For reasons that are known only to debtors and their counsel, they did not appear at the hearing on the motion which was held on June 28, 2005. At the conclusion of the

hearing, we issued an order sanctioning debtors for not complying with the orders of March 2, 2005, and April 20, 2005. The order effectively determined that the debt owed to Rapid Funding was excepted from discharge by §§ 523(a)(2)(A) and (B) and § 523(a)(4) of the Bankruptcy Code. The order noted that counsel to Rapid Funding had convinced us that a less drastic sanction would not be appropriate, as debtors' conduct in effect had prevented Rapid Funding from proving its case at trial.

On July 15, 2005, less than two weeks before the trial of this matter, debtors requested reconsideration of the order dated June 28, 2005. Among other things, debtors maintained that the court had not given "proper weight" to a prior allegation that the requested documents had been seized by inspectors for the U.S. Postal Service. If Rapid Funding wanted the documents, debtors replied curtly, it should ask the inspectors to make them available.

The request for reconsideration was denied on July 21, 2005. We stated in the order denying their motion that the totality of circumstances convinced us that debtors' failure to comply with previous discovery orders was willful and deliberate and was not the result of excusable neglect on the part of their counsel. Debtors, we concluded, were playing "fast and loose" with the court and were attempting to thwart an orderly judicial process in this case.

The matter was tried on July 27, 2005, at which time the parties were given an opportunity to offer evidence on the remaining issues in the case. Rapid Funding and debtors have submitted their post-trial briefs and the matter is now ready for decision.

## – DISCUSSION –

### – I –

The dischargeability of the debt owed to Rapid Funding by debtors is no longer at issue in this case. The order of June 28, 2005, which sanctioned debtors for not complying with prior orders compelling discovery, in effect determined that the debt in this case is excepted from discharge by §§ 523(a)(2)(A) and (B) and § 523(a)(4) of the Bankruptcy Code. Debtors' motion for reconsideration of the order was denied.

Prior to trial, Rapid Funding had recovered a total of $382,164.88 to satisfy the debt owed to it. It seized $140,173.76 from an account owned by debtor Diane Lynn Stabile and $13,991.12 from an account owned by Celestial Burial Case or Celestial Life Planning. In addition, Rapid Funding purchased for $228,000.00 the two real properties that were subject to its mortgage lien.

The issue remaining to be decided is the remaining amount, if any, of the non-dischargeable debt owed by debtors. Despite having already collected a total of $382,164.88, which exceeds the original principal amount of the loan by more than $68,000.00, Rapid Funding insists that it still is owed an additional $134,293.79 as of the date of trial, plus interest at the default rate of thirty-six percent on the unpaid balance compounded monthly.

Rapid Funding's position as to the outstanding amount of the debt was based on a spreadsheet prepared by one of its principals shortly before trial. Included among the charges comprising this amount are: (1) default interest at the rate of thirty-six percent *per annum* ($113,618.16); (2) repairs made to debtors' former residence after they had

vacated it ($19,674.00); (3) the cost of utilities – *i.e.,* gas, electricity and water – for the period from December of 2004 through June of 2005 ($3,259.51); and (4) the cost of surveying the property on which debtors' former residence is located ($395.00).

Debtors counter that the debt they owe to Rapid Funding has been fully satisfied. Rapid Funding has already collected a total of $382,644.71. Debtors further maintain that the appropriate rate of post-judgment interest is six percent rather than thirty-six percent, as Rapid Funding claims.

Regulation of the rate of interest charged for a loan lies within the police power of the Commonwealth of Pennsylvania. *Smith v. Mitchell*, 420 Pa. Super. 137, 140-41, 616 A.2d 17, 19 (1992). The right to charge interest is a privilege granted by statute and is subject to legislative control. *Id.*, 420 Pa. Super. at 141, 616 A.2d at 19.

According to debtors, the rate of interest that may be charged subsequent to entry of a judgment is capped at six percent by 42 Pa. C.S.A. § 8101, which provides as follows:

> Except as provided by another statute, a judgment for a specific sum of money shall bear interest at the lawful rate from the date of the verdict or award, or from the date of judgment if the judgment is not upon a verdict or award.

The "lawful rate" of such post-judgment, debtors continue, is set by 41 P.S. § 202, which provides as follows:

> Reference in any law or document heretofore or hereafter to "legal rate of interest" … without specification of the applicable rate shall be construed to refer to the rate of interest of six percent per annum.

The fact that the promissory note specifies a default interest rate of thirty-six percent, debtors insist, is of no consequence. A judgment resolves everything concerning the right to recovery; it resolves not only all matters that were raised, but also those matters which

might have been raised. The cause of action is merged in the judgment, which then evidences a new obligation. *Lance v. Mann*, 366 Pa. 26, 27, 60 A.2d 35, 36 (1948).

Debtors would have us conclude from this recitation of the law that the default rate of interest of thirty-six percent provided for in the promissory note does not apply in calculating the amount of interest that has accrued since judgment was confessed against debtors on October 12, 2003. Because Rapid Funding's right to default interest at the rate of thirty-six percent merged in the confessed judgment, debtors assert, it cannot seek default interest in this case and instead is entitled to interest only at the rate of six percent.

This reasoning is egregiously flawed. The principle that the right to post-judgment interest at the default rate specified in an agreement merges in the judgment and accrues instead at the statutory rate of six percent is not iron-clad. There is an exception to the principle.

The statutorily prescribed rate of post-judgment interest does not apply if the relevant documents indicate that the parties intended to continue the default rate after judgment is entered. *Stendardo v. Federal National Mortgage Association (In re Stendardo)*, 991 F.2d 1089, 1095 (3d Cir. 1993). The clear intent of the parties controls in such situations and overrides the above statutory provisions.

The relevant documents in this case unambiguously indicate that Rapid Funding and debtors agreed that the default rate of interest specified in the promissory note would continue *even after a judgment was entered*. Paragraph 7.11 of the mortgage, for instance, provides as follows:

> Notwithstanding the provisions of 42 Pa. C.S.A. § 8101 and any other applicable law to the contrary, the Default Rate shall apply to all sums

evidenced by the Note and also *after entry of a judgment or judgments against Mortgagors* (whether by suit on the Note, in a mortgage foreclosure action or otherwise). *Said judgment[s] shall bear interest at the Default Rate until satisfied in full.*

We conclude in light of the foregoing that interest on the debt owed to Rapid Funding continues to accrue at the default rate of thirty-six percent *per annum* until the debt is fully satisfied. The statutory rate of interest of six percent *per annum* does not apply here.

A final observation would be appropriate before we move on to the next portion of our analysis. While the interest rates specified in the promissory note unquestionably are rapacious, debtors do not contend that they are usurious and hence unlawful. Debtors appear to recognize that their financial situation was dire and that they could get a loan only at rates of interest well in excess of what they might expect if their financial situation were better.

Although debtors assert that the default interest rate of thirty-six percent no longer applied as of the date on which Rapid Funding confessed judgment against them, they do not challenge as usurious and unlawful either the "regular" interest rate of fifteen percent *per annum* or the default rate of thirty-six percent.

– II –

Our analysis does not end with the determination that the default rate of interest continues to apply to the outstanding debt after Rapid Funding confessed judgment against debtors.

In addition to default interest, Rapid Funding claims that the outstanding amount of debt owed to it includes: (1) repairs Rapid Funding made to debtors' former residence after they vacated it ($19,674.00); (2) the cost of utilities for the house for the period from

- 10 -

December of 2004 through June of 2005 ($3,259.51); and (3) the cost of surveying the property on which the residence was located ($395.00). These costs, all of which were incurred *after* debtors had moved out and Rapid Funding took possession, total $23,328.51.

Rapid Funding's principal testified at trial that he had not personally inspected debtors' former residence, but was advised by a third person that the roof and other portions of the house were in disrepair. He further testified that Rapid Funding paid a contractor a total of $19,674.00 to replace the roof and to make the other repairs. Neither the individual who allegedly advised Rapid Funding of the need to fix up the house nor the contractor who did the work, both of whom presumably were available to testify, corroborated the testimony of Rapid Funding's principal.

Rapid Funding bases its right to charge debtors for the cost of these repairs on paragraph 7.9 of the mortgage, which provides as follows:

> Should any part of the Property come into the possession of the Mortgagee, whether before or after an Event of Default, Mortgagee … may … make repairs … to the Property for the purpose of preserving its value. Mortgagors covenant to promptly reimburse and pay to Mortgagee … the amount of all reasonable expenses … incurred by Mortgagee in connection with its … preservation … of the Property, together with interest thereon from the date incurred by Mortgagee at the Default Rate ….

Debtors testified, in our estimation credibly, that they had replaced the roof only a few years earlier and did not need to be replaced and that the other repairs Rapid Funding made were not necessary to preserve the value of the property.

It is just as likely that the above work was done to enhance the value of the property as it is that it was done to preserve its value. Rapid Funding, which undoubtedly has the

burden of proof on this issue, failed to prove that the repairs were for the latter reason rather than the former. Allowing Rapid Funding to charge debtors for these so-called repairs would potentially create a windfall for Rapid Funding. Not only would the repairs enhance the value of the property, the cost of making them would be borne by debtors instead of Rapid Funding.

Rapid Funding also seeks to charge debtors a total of $3,259.51 for the cost of utilities for the months of December of 2004 through June of 2005. These costs were incurred after Rapid Funding became the owner of the property and after debtors had moved out.

Rapid Funding became the equitable owner of the property when "the hammer fell" at the sheriff's sale on September 7, 2004. *Butler v. Lomas & Nettleton Co.*, 862 F.2d 1015, 1019 (3d Cir. 1988). It became the legal owner of the property when the sheriff's deed was delivered in October of 2004. Only then did Rapid Funding have the right to possession of the property. *Id.*, 862 F.2d at 1019. Debtors subsequently moved out on November 18, 2004.

Rapid Funding has not established that these costs became due and owing while debtors were still in possession of the property. As a consequence, we conclude that they were not incurred while the property was subject to its mortgage lien. We know of no reason why debtors should be charged for preserving the value of the property when Rapid Funding owned the property.

Finally, Rapid Funding seeks to charge debtors $395.00 for the cost of surveying the property that had been debtors' residence. No indication was given as to when the survey

- 12 -

occurred. Moreover, no evidence was offered establishing that the survey was for the purpose of preserving the property while it still was subject to Rapid Funding's mortgage lien. The cost of the survey therefore is not chargeable to debtors.

We conclude in light of the foregoing considerations that, as of July 27, 2005, the outstanding amount of the debt owed to Rapid Funding by debtors was not $134,293.79, as Rapid Funding claims, but was $110,965.28[1] ($134,293.79 - $23,328.51 = $110,965.28). This amount is subject to interest at the default rate of thirty-six percent per annum until it is fully satisfied.

An appropriate order shall issue.

                                                      /s/
                                  **BERNARD MARKOVITZ**
                                  U.S. Bankruptcy Judge

Dated: **September 13, 2005**

---

[1] To the extent that this latter amount still is comprised of default interest at the rate of thirty-six percent for aforementioned costs that are not chargeable to debtors, it should be further adjusted downward in accordance with this memorandum opinion.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| **JOSEPH M. STABILE and PATRICIA M. STABILE,** | : : : | Bankruptcy No. 04-24447 BM |
| **Debtors** | : | Chapter 7 |
| ************************************************ | | |
| **RAPID FUNDING, LLC,** | : : | |
| **Plaintiff** | : : | |
| v. | : : | Adversary No. 04-3169 BM |
| **JOSEPH M. STABILE and PATRICIA M. STABILE,** | : : : | |
| **Defendants** | : | |

## ORDER OF COURT

**AND NOW**, this **13th** day of **September**, 2005, in accordance with the preceding memorandum opinion, it hereby is **ORDERED**, **ADJUDGED** and **DECREED** that:

(1) the debt owed to Rapid Funding by debtors Joseph and Diane Lynn Stabile is **NOT DISCHARGEABLE**; and

(2) the outstanding amount of said debt as of July 27, 2005, is **$110,965.28**, plus interest at the default rate of thirty-six percent *per annum* until it is fully satisfied.

It is **SO ORDERED**.

.                                                                                       **/s/**
                                                                                         **BERNARD MARKOVITZ**
                                                                                         U.S. Bankruptcy Judge

cm:   Brian A. Lawton, Esq.                          Office of United States Trustee
      Metz Lewis LLC                                  Liberty Center - Suite 970
      11 Stanwix Street - 18th Floor                  1001 Liberty Avenue
      Pittsburgh, PA  15222                           Pittsburgh, PA  15222

      Paul J. Elias, Esq.
      33 East Pittsburgh Street - Suite 8
      Greensburg, PA  15601